[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15535

_____

D.C. Docket No. 4:16-cv-00162-WTM-GRS

SCL BASILISK AG,
THORCO SHIPPING A/S,

Plaintiffs - Appellants,

versus

AGRIBUSINESS UNITED SAVANNAH LOGISTICS LLC,
AGRIBUSINESS UNITED INC.,
AGRIBUSINESS UNITED DMCC INC.,
AGRIBUSINESS UNITED DMCC (DUBAI) LLC,
SONADA AGRO LIMITED (UK) LLC,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(November 14, 2017)

Before WILLIAM PRYOR, JORDAN, and RIPPLE,[*] Circuit Judges.

_____

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

RIPPLE, Circuit Judge:

Invoking the district court's maritime jurisdiction, the plaintiffs SCL Basilisk AG ("SCL Basilisk") and Thorco Shipping A/S ("Thorco") brought this action for an order requiring the posting of security by Agribusiness United Savannah Logistics LLC ("Agribusiness Savannah"), Agribusiness United Inc., Agribusiness United DMCC, Inc., and Sonada Agro Limited (UK) LLC ("Sonada"), in aid of a pending international arbitration in London, United Kingdom.  After a hearing, the district court denied relief, and the plaintiffs timely appealed. We now affirm the district court's judgment.  The relief sought by the plaintiffs is not authorized by Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), Georgia law, or principles of maritime law.

# I

The underlying petition arose out of a commercial dispute between the plaintiffs, SCL Basilisk and Thorco, and defendants Agribusiness Savannah and Sonada,[1] over the performance of a charter agreement.  On December 30, 2015,

---

[1] In their petition, SCL Basilisk and Thorco identified the primary defendants as Agribusiness Savannah and Sonada; they alleged that the other named defendants, Agribusiness United Inc.,

SCL Basilisk executed a voyage charter party with Agribusiness Savannah for the carriage of grain from New Orleans to Portugal and Morocco.  Agribusiness Savannah later requested that the charterer be changed to Sonada for insurance coverage reasons.[2]  On March 4, 2016, a letter of indemnity was issued by Sonada as charterer and Agribusiness Savannah as guarantor.  The letter required the posting of security if the SCL Basilisk were arrested or detained, and provided for indemnification against liability, loss, and damage.

The M/V SCL BASILISK was detained pursuant to a writ of attachment issued in the Eastern District of Louisiana at the request of a nonparty on a claim unrelated to the present dispute.  There was a delay by Sonada and Agribusiness Savannah in posting security, and, as a result, SCL Basilisk incurred damages in the amount of $452,528.86.  In February 2016, SCL Basilisk instituted arbitration proceedings against Sonada and Agribusiness Savannah in a London arbitration as required by the charter agreement.

---

Agribusiness United DMCC Inc., and Agribusiness United DMCC (Dubai) LLC, were the primary defendants' "paying agents and/or alter egos." R.1, ¶ 3.

[2] SCL Basilisk discovered later that Sonada had been incorporated only two days before Agribusiness Savannah requested the change.

3

On June 24, 2016, SCL Basilisk filed a "Petition and Application for an Order for Security in Aid of Foreign Arbitration Pursuant to O.C.G.A. § 9-9-30" in the federal district court in Savannah, Georgia.[3]  In its petition, SCL Basilisk identified Sonada as a foreign entity having an office and registered agent in Savannah, Georgia, and a registered agent in Roswell, Georgia; Agribusiness United Inc. as a Georgia corporation with a principal office and registered agent in Savannah, Georgia; Agribusiness Savannah as a Florida corporation with a principal office address in Savannah, Georgia; and the other Agribusiness entities as foreign companies, but registered to do business, and with registered agents for service of process, in either Atlanta or Savannah, Georgia.[4]  The petition sought $667,528.86[5] to secure a possible judgment in the pending arbitration in London. It asserted that the requested relief was authorized by section 9-9-30 of the Georgia Code.

The district court expedited the matter and held a hearing on July 11, 2016. One week later, it issued an order denying the requested relief.  In its order, the

---

[3] *See* R.1 (capitalization removed).

[4] R.1, ¶¶ 6–10.

[5] This includes $200,000 for recoverable costs, including attorneys' fees, and for interest at the rate of 3.5% compounded quarterly.  *Id.*, ¶ 43.

4

district court first noted that the relief that the plaintiffs sought was not available under maritime law.  The court explained that Supplemental Rule B allows entities to sue in personam and attach property as security for a claim.[6]  Supplemental Rule B requires, however, that the plaintiff or the plaintiff's attorney sign and file an affidavit stating that the defendant cannot be found within the district.  The plaintiffs could not meet this requirement because, "according to their filings, all

---

[6] Supplemental Rule B states in relevant part:

**(1) When Available; Complaint, Affidavit, Judicial Authorization, and Process.**  In an in personam action:

**(a)** *If a defendant is not found within the district* when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.

**(b)** The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, *to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district.* The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

. . .

**(e)** The plaintiff may invoke state-law remedies under Rule 64 for seizure of person or property for the purpose of securing satisfaction of the judgment.

Fed. R. Civ. P. Supp. B (emphasis added).

5

Defendants are present in some fashion in this district."[7]  Rule C of the

Supplemental Rules[8] also was not available to the plaintiffs.  The district court

explained that Supplemental Rule C allowed a party to sue a ship directly in rem.

---

[7] R.30 at 5.

[8] Supplemental Rule C provides in relevant part:

> **(1) When Available.** An action in rem may be brought:
>
> **(a)** To enforce any maritime lien;
>
> **(b)** Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto.
>
> Except as otherwise provided by law a party who may proceed in rem may also, or in the alternative, proceed in personam against any person who may be liable.
>
> Statutory provisions exempting vessels or other property owned or possessed by or operated by or for the United States from arrest or seizure are not affected by this rule. When a statute so provides, an action against the United States or an instrumentality thereof may proceed on in rem principles.
>
> **(2) Complaint.** In an action in rem the complaint must:
>
> **(a)** be verified;
>
> **(b)** describe with reasonable particularity the property that is the subject of the action; and
>
> **(c)** state that the property is within the district or will be within the district while the action is pending.

Fed. R. Civ. P. Supp. C.

Because the plaintiffs are the owners of the M/V SCL BASILISK, pursuing

attachment under Supplemental Rule C would result in a suit against themselves.

The district court then evaluated whether the plaintiffs could recover under

section 9-9-30 of the Georgia Code.  That provision states: "Before or during

arbitral proceedings, a party may request from a court an interim measure of

protection, and a court may grant such measure, and such request shall not be

deemed to be incompatible with an arbitration agreement."  Ga. Code Ann.

§ 9-9-30.  According to the plaintiffs, section 9-9-30 grants courts the authority to

award petitioners "a broad range of provisional or interim relief."[9]  In evaluating

this request, the district court noted that it could apply state law to supplement

maritime law if the result did not "frustrate national interests in having uniformity

in admiralty law."[10]  The court looked to the test set forth in *Misener Marine*

*Construction, Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 839 (11th Cir. 2010):

"State law may be applied to issues of a maritime nature if:  (1) there is not an act

of Congress that speaks to the issue; (2) the state law does not contravene a

characteristic feature of the general maritime law; and (3) the state law does not

---

[9] R.1, ¶ 44.

[10] R.30 at 7 (quoting *Coastal Fuels Mktg., Inc. v. Fla. Express Shipping Co.*, 207 F.3d 1247, 1251 (11th Cir. 2000)).

7

interfere with the proper harmony and uniformity of maritime law." The district court then determined that, if section 9-9-30 had the broad scope that the plaintiffs imputed to it, the provision would run afoul of all three requirements.

First, the court observed that federal law already spoke to the intersection of maritime law, arbitration, and security pending arbitration. Section 8 of Title 9 of the United States Code allowed a party to begin a proceeding "hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings," and still proceed to arbitration. "The usual course of admiralty proceedings," the court continued, involves "libel or seizure pursuant to Rule B or Rule C."[11] "Because there is an act of Congress that speaks to the issue, and because the application of § 9-9-30 would contravene the application of this act," the court concluded that it could not "grant the relief Plaintiffs seek."[12]

The court further expressed the concern that the state statute "contravenes a characteristic feature of general maritime law and interferes with its harmony and

---

[11] *Id.* at 8.

[12] *Id.*

8

uniformity."[13]  In its view, "[m]aritime attachment is by any test a characteristic feature of the general maritime law."[14]  Plaintiffs, however, were seeking a remedy under state law because they were unable to meet the requirements of attachment under the Supplemental Rules.  According to the district court, allowing plaintiffs to seek attachment outside of the rules would not only subject entities to varying security and attachment requirements, it also would allow them to bypass the procedural requirements of the Supplemental Rules.

Finally, the court observed, even if there were no impediments to invoking the state statute, it could not "discern what relief would be applicable."[15]  In the district court's view, section 9-9-30 did not have the expansive scope that the plaintiffs attributed to it.  Instead, it simply permitted the court to grant remedies otherwise available under federal and Georgia law.  It did not create new remedies.

Accordingly, the district court denied the plaintiffs' request for an order of security.  The plaintiffs timely appealed.

---

[13] *Id.*

[14] *Id.* (quoting *ContiChem LPG v. Parsons Shipping Co.*, 229 F.3d 426, 433 (2d Cir. 2000)).

[15] *Id.* at 10.

## II

"Maritime parties are peripatetic, and their assets are often transitory." *Aqua Stoli Shipping Ltd. v. Gardner Smith Party Ltd*., 460 F.3d 434, 443 (2d Cir. 2006), *overruled on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 61 (2d Cir. 2009). Thus, "it is frequently, but not always, more difficult to find property of parties to a maritime dispute than of parties to a traditional civil action." *Id.* As plaintiffs acknowledge, "[t]he standard procedural mechanism . . . to address this problem is maritime attachment, which allows a plaintiff to secure its claim against a defendant's property found within a district and simultaneously to subject the defendant to the personal jurisdiction of the corresponding district court up to the value of the property attached."[16]

## A.

"Typically actions for attachment are brought under Rule B(1)(a) [of the] Supplemental Rules . . . ." *Everspeed Enters. Ltd. v. Skaarup Shipping Int'l*, 754 F. Supp. 2d 395, 400 (D. Conn. 2010). Rule B states in relevant part:

**(1)    When Available; Complaint, Affidavit, Judicial Authorization, and Process.** In an in personam action:

---

[16] Appellants' Br. 10–11.

> **(a)** *If a defendant is not found within the district* when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.

Fed. R. Civ. P. Supp. B (emphasis added). "[T]here are two reasons for the procedure authorized in Supplemental Rule B: to assure a respondent's appearance, and to assure satisfaction in case the suit is successful." *Nehring v. Steamship M/V Point Vail*, 901 F.2d 1044, 1051 (11th Cir. 1990) (alteration in original) (quoting *Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 637 (9th Cir. 1982)). "Supplemental Rule B, however, cannot be used purely for the purpose of obtaining security: 'The two purposes may not be separated, however, for security cannot be obtained except as an adjunct to obtaining jurisdiction.'" *Id.* (quoting *Seawind Compania, S.A. v. Crescent Line, Inc.*, 320 F.2d 580, 582 (2d Cir. 1963)).

Here, SCL Basilisk and Thorco cannot meet the requirements for invoking Rule B(1)(a). Specifically, all of the defendants *can be found* in the district.[17]

---

[17] The plaintiffs suggest for the first time in their reply brief that, depending on how the language of Rule B is interpreted, the defendants' registrations to do business in the district may not render them "found within the district" for purposes of Supplemental Rule B. Reply Br. 5 (internal quotation marks omitted). This is both contrary to the position they took in their opening brief,

11

Thus, at least in these circumstances, the plaintiffs' purpose in invoking Rule B is not "to gain jurisdiction over an absent defendant," *Aqua Stoli Shipping Ltd.*, 460 F.3d at 437, and Rule B(1)(a) is inapplicable.  *See Everspeed Enters. Ltd.*, 754 F. Supp. 2d at 400 (holding that "Rule B(1)(a) is inapplicable" where each of the defendants resides or has a principal place of business in the district in which the action is brought).  Indeed, the plaintiffs admit that such is the case:  "When a defendant appears by registration within a district, attachment under Rule B(1)(a) is no longer available."[18]

## B.

Rule B, however, also allows plaintiffs to employ state measures of protection.  Supplemental Rule B(1)(e) provides that a "plaintiff may invoke

---

*see* Appellants' Br. 22 ("When a defendant appears by registration within a district, attachment under Rule B(1)(a) is no longer available."), and in the district court, *see* R.35 (Tr. Hr'g July 11, 2016) at 15 ("Now, because the defendants know that Rule B was going to be employed against them, they took affirmative steps to avoid us from being able to use the Rule B remedy."); *see also id*. at 11, 13, 17 & 19.  However, even if the plaintiffs had not conceded the point, we would not consider this argument because they failed to raise it before the district court, *see Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1296 (11th Cir. 2010) ("[I]ssues not raised in the district court should not be considered on appeal."), and they failed to raise it in their opening brief, *see Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1351 n.11 (11th Cir. 2009) ("Because they raised this argument for the first time in their reply brief, we treat this argument as waived.").

[18] Appellants' Br. 22.

12

state-law remedies under Rule 64 for seizure of person or property for the purpose

of securing satisfaction of the judgment." Fed. R. Civ. P. Supp. B(1)(e). For its

part, Federal Rule of Civil Procedure 64 provides:

> **(a) Remedies Under State Law—In General.** At the
> commencement of and throughout an action, every remedy is
> available that, under the law of the state where the court is located,
> provides for seizing a person or property to secure satisfaction of the
> potential judgment. But a federal statute governs to the extent it
> applies.
>
> **(b) Specific Kinds of Remedies.** The remedies available under this
> rule include the following—however designated and regardless of
> whether state procedure requires an independent action:
>
> • arrest;
> • attachment;
> • garnishment;
> • replevin;
> • sequestration; and
> • other corresponding or equivalent remedies.

Fed. R. Civ. P. 64.

Although at least some of these specifically enumerated remedies are

available under Georgia law, *see* Ga. Code Ann. § 18-3-1 (identifying grounds of

attachment); *id*. § 18-4-1 *et seq*. (setting forth garnishment procedures), the

plaintiffs have not pursued them. Instead, they have petitioned for "an order

13

requiring the posting of security pursuant to Georgia Code . . . § 9-9-30."[19]

According to the plaintiffs, section 9-9-30 provides a remedy that "correspond[s]"

or is "equivalent" to those enumerated in Rule 64(b).[20]  In their view, the provision

is a grant of authority empowering courts to *create* interim measures of protection.

We cannot accept this argument.

### 1. Language and history of section 9-9-30

Section 9-9-30 of the Georgia Code is a provision within Georgia's

relatively recently enacted International Commercial Arbitration Code.[21]  The

provision states, "Before or during arbitral proceedings, a party may request from a

court an interim measure of protection, and a court may grant such measure, and

such request shall not be deemed to be incompatible with an arbitration

agreement."  Ga. Code Ann. § 9-9-30.  On its face, the language of section 9-9-30

reflects the policy that a party's resort to a court for an order to preserve assets (in

the event of arbitral victory) or to protect trade secrets (in the course of arbitral

discovery) is compatible with having the merits of a dispute determined in an

---

[19] R.1, ¶ 1.

[20] Appellants' Br. 14 (alteration in original) (quoting Fed. R. Civ. P. 64(b)).

[21] *See* Ga. Code Ann. § 9-9-20(a) ("This part shall be known and may be cited as the 'Georgia International Commercial Arbitration Code.'").

14

arbitral forum.  The provision therefore serves an important function in fostering a legal climate conducive to international arbitration[22]:  it guarantees that a party's resort to a court for interim measures cannot be interpreted as a waiver of his or her right to arbitrate the merits of the underlying dispute.

This plain meaning is confirmed by the notes to the working drafts and the final report of the United Nations Commission on International Trade Law regarding the Model Law on International Commercial Arbitration ("UNCITRAL Model Law"), on which Georgia's International Commercial Arbitration Code is based.  *See* Stephen L. Wright & Shelby S. Guilbert Jr., *Recent Advances in International Arbitration in Georgia: Winning the Race to the Top*, 18 Ga. B.J., June 2013, at 18–19 ("The ICA Code itself is based primarily upon the 1985 UNCITRAL Model Law on International Commercial Arbitration . . . , as amended in 2006.").[23]  In the notes to the Fourth Draft, the drafters observe:

---

[22] *See* Ga. Code Ann. § 9-9-20(b) ("The purpose of [the Georgia International Commercial Arbitration Code] is to encourage international commercial arbitration in this state, to enforce arbitration agreements and arbitration awards, to facilitate prompt and efficient arbitration proceedings consistent with this part, and to provide a conducive environment for international business and trade.").

[23] Section 9-9-30 is based on Article 9 of the UNCITRAL Model Code which reads:  "It is not incompatible with an arbitration agreement for a party to request, before or during arbitral proceedings, from a court an interim measure of protection and for a court to grant such measure."  In their reply brief, the plaintiffs submit that, because the Georgia General Assembly

15

20.  Article 9 expresses the principle of compatibility of an arbitration agreement with a request to a court for an interim measure.  There are two aspects of this principle.

21.  One aspect is that it applies to courts of the State of the model law requested to grant an interim measure and provides that a court shall not refuse to grant such a measure on the ground that there is an arbitration agreement.

22.  The other aspect is that the rule expresses the principle according to which a request by a party for an interim measure should not be construed as a waiver of the arbitration agreement.  This principle should apply irrespective of whether such a request is made to a court in the State of the model law or to a court in any other State.

Howard M. Holtzmann & Joseph E. Neuhaus, *A Guide to the UNCITRAL Model Law on International Commercial Arbitration* 341 (1989) ("Holtzmann & Neuhaus") (quoting Fifth Secretariat Note Territorial Scope of Application and Related Issues A/CN.9/WG.II/WP.49 (21 December 1983)) (bracketed references omitted).  Moreover, the Commission's final report confirms that Article 9 was not meant to expand the panoply of remedies available in the courts of states that may adopt the UNCITRAL Model Code:

---

used the active, as opposed to the passive, voice in part of section 9-9-30, it must have intended a different—and broader—meaning.  There is no support for this assertion.

As will be discussed in greater detail, *see infra* note 28, UNCITRAL amended the Model Code in 2006.  The language that forms the basis of section 9-9-30, however, did not change.

16

> It was understood that article 9 itself did not regulate which interim measures of protection were available to a party. It merely expressed the principle that a request for any court measure available under a given legal system and the granting of such measure by a court of "this State" was compatible with the fact that the parties had agreed to settle their dispute by arbitration.

*Id.* at 345–46 (quoting Commission Report A/40/17 (21 August 1985)). Thus, the official commentary to the UNCITRAL Model Law dispels any notion that the provision was intended to authorize new remedies. Instead, section 9-9-30 simply confirms that a party's request to have a court order an interim measure already within its legal arsenal is compatible with that party's desire to submit the merits of the dispute to arbitration.[24]

---

[24] A number of other states have adopted a version of Article 9 of the UNCITRAL Model Code. *See* Cal. Civ. Code § 1297.91; Conn. Gen. Stat. Ann. § 50a-109; 710 Ill. Comp. Stat. Ann. § 30/5-15; La. Rev. Stat. Ann. § 9:4249. As with Georgia's version, courts in those jurisdictions have not had the opportunity to address definitively the meaning of those provisions. Two cases, however, shed some light on how these statutes are viewed. *See Stemcor USA Inc. v. CIA Siderurgica Do Para Cosipar*, 870 F.3d 370 (5th Cir. 2017); *Everspeed Enters. Ltd. v. Skaarup Shipping Int'l*, 754 F. Supp. 2d 395 (D. Conn. 2010). In *Stemcor USA*, the Fifth Circuit held that the Louisiana attachment statute could be used to secure an arbitral judgment prior to the prevailing party commencing a confirmation proceeding. 870 F.3d at 380. In doing so, the court noted that "[r]eading Louisiana law to allow for pre-suit attachment in aid of arbitration makes sense of the statutory scheme as a whole because other provisions of Louisiana law *assume that some state-law preliminary remedies are available* to aid arbitration." *Id*. at 379 n.6 (emphasis added). The court went on to observe that Louisiana had adopted the UNCITRAL Model Law and that "[i]t would be strange for Louisiana to have adopted the UNCITRAL Model Law without allowing for state law interim remedies in aid of arbitration." *Id.* Had the court believed that Louisiana's version of the UNCITRAL Model Law was an independent grant of substantive relief, it would not have had to consider if Louisiana's attachment statute provided a remedy.

17

## 2. Language and history of section 9-9-38

The plaintiffs also note that the term "interim measure" is employed in another part of the International Commercial Arbitration Code, section 9-9-38. They explain that "[t]he ICA Code expressly gives *an* arbitrator the authority, upon application of a party, to 'grant interim measures as [the arbitrator] deems appropriate' and to 'modify, suspend or terminate' such measures."[25]  "With no indication to the contrary," the plaintiffs conclude, "it then follows that § 9-9-30, which employs the same phrase, 'interim measure,' is designed to extend a similar authority to the courts."[26]

---

Similarly, in *Everspeed Enterprises*, the plaintiff had supplemented a previous application for prejudgment remedy "with an application for an order *pendente lite* in aid of the arbitration" under sections 50a-109 (Connecticut's version of Article 9) and 52-422 (Connecticut's *pendente lite* statute). *Id.* at 404.  While recognizing that it had the "jurisdiction and authority to grant injunctions and provisional remedies in the context of pending arbitrations, including international arbitrations" under section 50a-109, the court questioned whether it had the authority to provide the plaintiff with the relief it sought because the specific statutory requirements for an order *pendente lite* had not been met. *Id.* at 405 (quoting *Bahrain Telecomm. Co. v. Discoverytel, Inc.*, 476 F. Supp. 2d 176, 180 (D. Conn. 2007)).  As in *Stemcor USA*, if the court perceived section 50a-109 as an independent grant of substantive authority, as opposed to an enabling statute that authorized the use of existing state remedies in aid of international arbitration, it would not have undertaken this inquiry.

[25] Appellants' Br. 28 (second alteration in original) (emphasis added).

[26] *Id.*

18

The fact that sections 9-9-30 and 9-9-38 both employ the term "interim measure" does not mean that the measures available to courts under section 9-9-30 are coextensive with those available to arbitrators under section 9-9-38.  Read in its entirety, the language of the two provisions is not the same; section 9-9-38 expressly gives an arbitrator the authority to "grant interim measures *as it deems appropriate*."  Ga. Code Ann. § 9-9-38(a) (emphasis added).[27]  Courts are not granted the same leeway.

---

[27] Section 9-9-38 reads in relevant part:

> (a) Unless otherwise agreed by the parties, the arbitration tribunal may, at the request of a party, grant interim measures as it deems appropriate.

> (b) The arbitration tribunal may modify, suspend, or terminate an interim measure it has granted, upon application of any party or, in exceptional circumstances and upon prior notice to the parties, on the arbitration tribunal's own initiative.

> (c) The arbitration tribunal may require the party requesting an interim measure to provide appropriate security in connection with the measure.

> . . .

> (g) The party who is seeking or has obtained recognition or enforcement of an interim measure shall promptly inform the court of any termination, suspension, or modification of that interim measure.

> (h) Where recognition or enforcement of an interim measure is sought in a court of this state, such court may order the requesting party to provide appropriate security if the arbitration tribunal has not already made a determination with respect to security or where such a decision is necessary to protect the rights of third parties.

19

That the Georgia General Assembly intended to provide arbitrators with greater flexibility than courts with respect to interim measures also finds support in section 9-9-39. Section 9-9-39, concerning enforcement of interim measures, recognizes that an arbitral panel's authority to order interim measures of protection may extend beyond that of the courts. It provides that a court may refuse to recognize or enforce an interim measure ordered by an arbitrator if the court determines that the measure "is incompatible with the powers conferred upon the court, unless the court decides to reformulate the interim measure to the extent necessary to adapt it to its own powers and procedures." Ga. Code Ann. § 9-9-39(a), (a)(2)(A). If the power of arbitrators and courts to order interim measures were coextensive, this provision would be unnecessary.

The commentary to the UNCITRAL Model Code also supports the conclusion that the scope of 9-9-30 and 9-9-38 are very different. As originally drafted, Article 17 of the UNCITRAL Model Code, on which 9-9-38 is based, stated:

> Unless otherwise agreed by the parties, the arbitral tribunal may, at the request of a party, order any party to take such interim measure of protection as the arbitral tribunal may consider necessary in respect of the subject-matter of the dispute. The arbitral tribunal may require any party to provide appropriate security in connection with such measure.

20

UNCITRAL Model Law Art. 17 (1985), *reprinted in* Holtzmann & Neuhaus at 1245.  Commentators observed that Article 17 was "related to, but distinct from, Article 9, which states that it is not incompatible with the arbitration agreement for a party to request from a *court*—or for the court to grant—an interim measure of protection."  Holtzmann & Neuhaus at 530.  The articles differ in that, "[u]nlike Article 17, *Article 9 does not grant any authority* but only states the principle that certain action, if permitted under other law, is not inconsistent with arbitration." *Id*. (emphasis added).  Although the 2006 Amendments to the UNCITRAL Model Law significantly expanded Article 17, those amendments did not blur the distinction between the powers of arbitrators and the powers of courts to grant interim measures of protection.[28]

---

[28] Article 17 now reads:

Article 17.  Power of arbitral tribunal to order interim measures

(1)  Unless otherwise agreed by the parties, the arbitral tribunal may, at the request of a party, grant interim measures.

(2)  An interim measure is any temporary measure, whether in the form of an award or in another form, by which, at any time prior to the issuance of the award by which the dispute is finally decided, the arbitral tribunal orders a party to:

21

> (a)  Maintain or restore the status quo pending determination of the dispute;
>
> (b)  Take action that would prevent, or refrain from taking action that is likely to cause, current or imminent harm or prejudice to the arbitral process itself;
>
> (c)  Provide a means of preserving assets out of which a subsequent award may be satisfied; or
>
> (d)  Preserve evidence that may be relevant and material to the resolution of the dispute.

UNCITRAL Model Law on International Commercial Arbitration 1985 With amendments adopted in 2006 (2008), http://www.uncitral.org/pdf/english/texts/arbitration/ml-arb/ 07-86998_Ebook.pdf.  The 2006 Amendments also expanded Article 17 in other ways, most notably by (1) the addition of Articles 17 B and 17 C, which set forth procedures for a different procedural tool, "preliminary orders"; and (2) the addition of Articles 17 H and 17 I, which address the recognition and enforcement of interim measures.  *Id.*

Although the Georgia General Assembly incorporated much of the new recognition and enforcement language into its International Commercial Arbitration Code, *see* Ga. Code Ann. §§ 9-9-38, 9-9-39, it did *not* incorporate the 2006 Amendments' definition of interim measure.

Despite this fact, the plaintiffs urge that this definition should govern the court's consideration of their petition.  The plaintiffs' argument proceeds as follows:  The Georgia General Assembly modeled the International Commercial Arbitration Code on the UNCITRAL Model Code.  UNCITRAL defined "interim measure" broadly in its Arbitration Rules.  *See* Reply Br. 9.  The plaintiffs therefore conclude that,

> [i]f the Assembly had meant to limit parties' relief to use of Georgia's attachment statute, the Assembly would not have adopted this broad language wholesale when a simple cross-reference to the attachment statute would have sufficed.  Notably, the Assembly did not simply copy Article 9 of the Model Law; it rearranged the language as it saw fit, yet it retained "interim measure of protection."  This suggests that the Assembly meant to incorporate the prevailing international meaning of the term "interim measure."

*Id.* at 10 (citations omitted).

22

In sum, none of the SCL Basilisk's arguments persuade us that section 9-9-30 grants a court authority to create new substantive remedies; rather it confirms that a court's grant of interim relief, utilizing existing state remedies, is not inconsistent with submitting a merits determination to an arbitrator.[29]

## C.

The plaintiffs' final argument is that, even if the relief they seek is not specifically authorized by Supplemental Rule B or section 9-9-30, the district court nonetheless possesses equitable powers under maritime law to grant the security in aid of arbitration that they seek. In making this argument, the plaintiffs rely

---

The plaintiffs are correct that the Georgia General Assembly did not adopt wholesale the UNCITRAL Model Code. However, the discretion the General Assembly exercised in determining which provisions to adopt and which to leave out cuts against the plaintiffs' argument. The UNCITRAL Model Code contains an expansive definition of interim measure (indeed, one that is materially indistinguishable from that incorporated into the UNCITRAL Model Arbitration Rules, *see id.* at 9); yet this definition was *not* incorporated into Georgia's International Commercial Arbitration Code. This intentional omission suggests that the General Assembly did not intend for courts to employ the UNCITRAL Model Law's definition of interim measure.

[29] Because section 9-9-30 is not a substantive grant of authority, it does not conflict, indeed it is consonant, with 9 U.S.C. § 8, which "permit[s] a party having an admiralty cause of action to commence a suit in admiralty, despite an agreement to arbitrate, so that 'the vessel or other property' may be seized and held as security until the arbitration is concluded." *Greenwich Marine, Inc. v. S.S. ALEXANDRA*, 225 F. Supp. 671, 674 (S.D.N.Y. 1964).

23

primarily on *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. de Navegacion*, 773 F.2d 1528 (11th Cir. 1985) (en banc).

In *Leonhardt*, Bottacchi's property had been attached pursuant to Supplemental Rule B.  Bottacchi then moved to dismiss the complaint and quash the process of attachment.  It "argued that Rule B(1)[30] violated due process in failing to provide adequate judicial supervision of the attachment process and that, because the rule constituted the sole authority for the court's issuance of the writ, the writ had to be dissolved."  *Id.* at 1530.  The district court held that Bottachi's due process rights had not been violated because it had been afforded preseizure notice and a timely hearing.  *See id.*  Nevertheless, the district court held Rule B(1) invalid under the Due Process Clause because it failed to provide "(1) procedural safeguards in place of preseizure notice and hearing; and (2) a prompt postattachment hearing."  *Id.*

A panel of this court reversed, holding "that because Bottacchi was accorded due process in the particular case, the lower court erred in proceeding to determine the facial constitutionality of Rule B(1)."  *Id.*  We took "the case en banc to

---

[30] At issue in *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. de Navegacion*, 773 F.2d 1528 (11th Cir. 1985) (en banc), was the constitutionality of the former version of Supplemental Rule B.

24

address the confusion that appears to have arisen in the district courts over the relationship between Rule B(1) and the courts' inherent admiralty powers." *Id.* at 1530–31.

Turning to the question of the courts' inherent admiralty powers, we determined that the district court did have "the power to issue the writ of attachment independent of its authority derived under Rule B(1)." *Id.* at 1531. We observed that, "[w]hen the Constitution was adopted, the existing maritime law became the law of the United States 'subject to power in Congress to alter, qualify or supplement it as experience or changing conditions might require.'" *Id.* at 1531–32 (quoting *Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 43, 55 (1934)). Among the maritime procedures in place at the time of the Constitution was maritime attachment, according to which "the person injured may have his action *in personam*, and compel appearance by the process of attachment on the goods of the trespasser." *Id.* at 1532–33 (quoting *Manro v. Almeida*, 23 U.S. (10 Wheat.) 473, 495–96 (1825)).

We then turned to whether Congress had altered the concept of maritime attachment as it existed at the time of the Constitution's adoption. We observed that the Supplemental Rules, "promulgated by the Supreme Court and enacted by

25

Congress[,] constitute[d] the only statutory restrictions on maritime attachment placed on a federal district court's power to apply admiralty law and procedure." *Id.* at 1533.  The advisory committee notes to those rules made clear, however, that the Supplemental Rules were "not to be construed as limiting or impairing the traditional power of a district court, exercising the admiralty and maritime jurisdiction, to adapt its procedures and its remedies in the individual case, *consistently* with these rules."  *Id.* (quoting Fed. R. Civ. P. Supp. A advisory committee's note) (emphasis added).  Evaluating the procedures that the district court had employed, we concluded that those procedures, which included a timely postattachment hearing, were "entirely consistent with Rule B(1)."  *Id.*  Because the court had exercised its inherent maritime powers—and had done so consistently with the Supplemental Rules—there was no occasion to consider the constitutionality of Rule B.  The only remaining question was whether "the procedures utilized by the district court" comported with due process.  *Id.*  We concluded that "the concept of due process [was] sufficiently flexible and the realm of admiralty sufficiently distinct to uphold the constitutionality of the procedures afforded Bottacchi by the district court in the exercise of its inherent power to apply maritime law."  *Id.* at 1539.

26

Similar to their reading of section 9-9-30, the plaintiffs perceive *Leonhardt* as granting district courts *carte blanche* "to fashion appropriate prejudgment remedies" as justice so requires.[31] We do not view *Leonhardt* as supporting such a broad proposition. In *Leonhardt*, we determined that district courts possess the inherent admiralty powers that existed at the time the Constitution was adopted. Congress, we acknowledged, had the power to alter those powers and had done so in the Supplemental Rules. Nevertheless, district courts still may apply and adapt their inherent admiralty powers as long as they do so consistently with the Supplemental Rules.

---

[31] Appellants' Br. 22. In their reply brief, the plaintiffs rely on *United Shipping Services Three, Inc. v. U.S. Express Lines, Ltd.*, No. CIV. A. 98-950, 1998 WL 770599 (E.D. Penn. Nov. 5, 1998), and *Trans Ocean v. Baltic Shipping Co.*, Civ.A. Nos. 95-2192 & 95-2635, 1995 WL 495908 (E.D. La. Aug. 18, 1995), for the proposition that *Leonhardt* "only required that a district court act 'consistently with [the] rules' holistically, and it did not specify any brightline requirements." Reply Br. 4 (quoting *Leonhardt*, 773 F.2d at 1533). Neither case, however, is persuasive. In *United Shipping Services Three*, the court mistakenly characterized our holding in *Leonhardt* accordingly: "even if Rule B does not apply because the defendant could be found within the district, a district court might attach property under its general inherent admiralty powers." 1998 WL 770599, at *1. The court went on to state that it did not agree with that holding and determined, instead, that "a maritime attachment of defendant's property must comply with Rule B." *Id. Trans Ocean*, as well, does not support plaintiffs' assertion. It merely summarizes the general principle from *Leonhardt* that "federal courts have inherent power to issue and maintain writs of maritime attachment quite apart from the requirements of Rule B." *Trans Ocean*, 1995 WL 495908, at *2 n.2.

27

Properly understood, therefore, it is clear that *Leonhardt* does not support the plaintiffs' claim for security in aid of arbitration.  Although we recognized in *Leonhardt* that district courts have inherent admiralty powers, those powers are the ones that existed at the time the Constitution was adopted.  At the time the Constitution was adopted, courts did possess the power to attach a vessel; however, then as now, one of the purposes of maritime attachment was to secure jurisdiction.  *See id.* at 1532–33 ("[T]he person injured may have his action *in personam*, and compel appearance by the process of attachment on the goods of the trespasser . . . ." (quoting *Manro*, 23 U.S. (10 Wheat.) at 496).  Thus, the plaintiffs are seeking a remedy different from any historical concept of maritime attachment.  Moreover, *Leonhardt* confirmed that a district court must exercise its inherent admiralty powers consistent with the Supplemental Rules.  As we have discussed at some length,[32] Supplemental B "cannot be used purely for the purpose of obtaining security: . . . security cannot be obtained except as an adjunct to obtaining jurisdiction."  *Nehring*, 901 F.2d at 1051 (quoting *Seawind Compania, S.A.*, 320 F.2d at 582).  A district court's order of attachment solely for the purpose

---

[32]  *See supra* at 10–12.

28

of obtaining security, therefore, would be contrary to the Supplemental Rules.

However, this is exactly the relief that the plaintiffs are seeking.

## Conclusion

We conclude that neither Rule B, section 9-9-30, nor principles of maritime

law authorize the specific relief sought by the plaintiffs.  We therefore affirm the

district court's judgment.

**AFFIRMED**

29

JORDAN, Circuit Judge, concurring.

For me, this case ultimately comes down to how we interpret the phrase "interim measure of protection" in Ga. Code. Ann. § 9-9-30.  Unfortunately, we do not have any guidance from the Georgia courts on the meaning of this language.

Admiralty courts may in appropriate cases apply equitable principles, *see, e.g., Schoenamsgruber v. Hamburg Am. Line*, 294 U.S. 454, 477 (1935), but the Supreme Court has not allowed federal courts to order the pre-judgment restraint of assets under their traditional equity powers.  *See, e.g., Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999); *De Beers Consolidated Mines Ltd. v. United States*, 325 U.S. 212, 222–23 (1945).  Against this backdrop, I would not read the phrase "interim measure of protection" as permitting an order requiring the posting of pre-judgment security for a pending arbitral proceeding.   With these thoughts, I join the court's opinion.